Our first case is United States of America and State of New Jersey, XRL Druding v. Care Alternatives. Mr. Paul? Good morning, Your Honor. I'm actually Mr. Scarborough. I'm from the United States, from the Department of Justice, and we're participating on behalf of the relators. They've ceded 10 minutes of their time. We thought it was best for us to go first because we're primarily addressing the legal principles that we think should govern in this case. So with the Court's indulgence, the United States is participating in this appeal because the objective falsity requirement adopted by the district court has no basis in the text of the False Claims Act and if adopted by this court, would potentially immunize health care providers from False Claims Act liability when they knowingly bill for inappropriate services, so long as they produce an expert witness who asserts that such services are appropriate. Is that because there's a difference between legal falsity and actual falsity? I'm not sure that that's the distinction I would hang my hat on. I think what I would go to, Your Honor, is the simple proposition that a claim is false when it does not meet the eligibility requirements established by the government for paying the claim. Well, that was sort of the point of my question because when I think actually false, I think of a lie, right? But under these regulations, you could have a perfectly proper treatment. Right. The person could be terminal. Let's say a true diagnosis, an accurate diagnosis would be four months, let's say, but yet it still could be a False Claims Act if they don't submit the documents required by the regulation. Is that the government's position? I have to take out a little bit. It could still be false. In other words, the claim could still be ineligible for payment. And, again, the critical thing about this case, and I think the part we're going to, I'm sure, be talking a lot about the Eleventh Circuit's Acera Care opinion, but one of the ways in which I think that that court went astray, there's good parts and bad parts for the government in that case, but one of the ways it went astray is not recognizing that there are two fundamental conditions of payment, governing eligibility for hospice care, and they're complementary and reinforcing. The first is, of course, the certification by an appropriate physician that the patient is terminally ill. The second, reinforcing one, and a really, really important safeguard, is that there be clinical information and other documentation that supports the medical prognosis. And that's obviously to prevent a physician from being sloppy in certifying, from certifying without any basis in the medical record. So, Bill, let me ask you a question then. So is compliance with the supporting documentation, obviously we're talking about B-2, is that an independent condition of payment? Yes, Your Honor. That's precisely the point that I think that the Eleventh Circuit either missed or did not give appropriate emphasis to. I want to be careful in how I characterize that opinion because I haven't had enough time to spend with that opinion. And that condition of payment is found in 42 CFR 418.22B. There's two independent certification requirements, and I want to emphasize that it makes sense that there be a requirement that there be some supporting documentation in the medical record because certification for hospice is a really, really big deal. It means the patient is foregoing curative treatment and is only going to be taking palliative treatment. So CMS naturally wants to make sure that there's a real basis for putting these people in. And, of course, there is a profit motive on the hospice side. I'm not saying, I'm not impugning hospice providers, but there is a profit motive for putting people into hospice. Well, let me ask you this question then. So is the rule that you'd like us to adopt that a genuine dispute exists as to falsity whenever an expert determines the documents do not support hospice eligibility? Yes, Your Honor. That creates a fact question for a jury as to the element of falsity. And I want to be very clear that that doesn't mean fact question is to ultimate liability. There are multiple elements for falsity. Well, it's the first step. It's the first step. In other words, it clears the first hurdle in getting you to the end. And part of the problem here is what the district court below in this case did, as the district court in the Sarah Care did, was try to put things like whether a doctor has a reasonable basis for making the terminal prognosis into the box of falsity. That's more appropriately addressed in the box of knowledge. Whether the, you know, if the provider is submitting claims that have a reasonable basis, in other words, the doctors have reasonable bases, it's going to be very difficult, perhaps impossible, to show in those circumstances that the defendant has acted with the requisite scienter in submitting false or fraudulent claims. However, the claims may well still be ineligible for payment. One additional point, can I make just one more point about the ineligibility point, is that this is something that CMS does, that the false of the inquiry is congruent with the eligibility inquiry. And I want to refer the court to a case we cited at page 19 of our amicus brief. It's In Re Solari. This is basically the Medicare Appeals Council revealing an ALJ determination that certain hospice claims, despite having the certifications of terminal illness, were nevertheless ineligible for payment because the documentation wasn't there to support the certification. That's the sort of thing that CMS does, and that's the sort of thing that a properly instructed jury with expert guidance and testimony could also do. You really, is it oversimplifying it too much to say you need two basic things. You need a doctor's diagnosis, and you need the documents to back it up. That's correct, Your Honor. I don't think that's really oversimplifying it. And here we have a doctor's diagnosis. Correct. But we've got another doctor, expert witness, challenging the backup and the quality of the backup. We have a challenge to the backup. And coupled with that, again, what makes it a false claims act case, as opposed to a case of, you know, okay, reasonable doctors can disagree, is that you have at least allegations and some evidence, and the Relators Council will speak to this more, that the certifications were made without actually looking at the records. They were sort of signed in bulk, that there was pressure from on high, you know, to chart to the negative, in other words, to get the people to look more hospice eligible than they in fact were. And it's that sort of extra evidence that comes in and creates a case on the knowledge component. In other words, that they're acting with reckless disregard in submitting these claims. Counsel, I think in part that the two sides are dueling over the practical problems here. One side says that, you know, none of these cases need to get called to house without summary judgment. The other side, that none of them will ever make it to trial. I'd like to know in practice, how does the U.S. approach its opportunity to take charge of the cases or to prevent them from going forward? Is there any idea whether the numbers or the fraction of cases in which the U.S. steps in and says, no, not only are we not getting involved, but we're not going to allow this case to proceed? It's very hard to generalize on that. There has been recent guidance published by the Department of Justice in January of 2018 that is public that talks about the government more aggressively exercising its authority under 3730C2A. That's the motion to dismiss authority. In other words, when it feels that the case going forward is in some way contrary. Just stop talking for a second, because that's distracting. I just want to hear everything you're saying. Sure. Is it off now? So the government takes very seriously the idea that the False Claims Act does, in fact, contemplate declined QI-TAM cases going forward. And that's clearly part of the statute is that the government may decide in the exercise of its resources to not intervene and participate in a case, but the case can still go forward. Congress clearly wanted that. But we do look at these cases. There are a lot of cases. So I'm sorry if that sounds like a dodge. It's not. It's just we do look at these cases carefully. And sometimes I can say this at a general level. Sometimes the reasons for not participating in a case, not intervening and taking the case over, have nothing to do with the merits. They may have to do with the size of the case. It could be with the size or difficulties proving, you know, substantial damages that we just don't think it's worth our resources for taking it. So you run the gamut. Let me ask you this question. So the district court provided that falsity could be found where the records were altered, and information was withheld from a certifying physician or a physician was not exercising medical judgment. How is that different from the Sixth Circuit's Paulus case? I'm not sure that the district court spelled it out that way. I think the Eleventh Circuit, I agree with you, that the Eleventh Circuit, when it said, here are some examples of things that could be objectively false, said, you know, when a physician fails to look at the records, when the physician doesn't actually believe that they're terminally ill. Well, I guess I'm looking at the district court in the following way and tell me if I'm not looking at it right. It seems like for the judge there, I hate to think of it as once issue is joined, but once there are battling doctors, that that's kind of the end of it, unless there was some evidence of, you know, alteration of records, et cetera. And I just actually wanted to know what your thoughts were on the Paulus case as it relates to that analysis. Well, we think that analysis is wrong, that sort of just because you get ultimately to battling doctors. I mean, if the doctors are battling over whether the evidence in the record is sufficient to support the terminal prognosis, in other words, one doctor says, look, no reasonable physician could actually think that this person who is 70 years old and has, you know, some ailments but not any ailments indicating morbidity, you know, that's a perfectly reasonable fact dispute for a jury to referee as it does in med mal cases. And so I think that's sort of my answer is that Paulus recognizes that. I mean, Paulus had, I think, the difficulty with that case is Paulus had some indicia, larger indicia of fraud by that cardiologist in that case. But what I really want to emphasize is that the relator or the United States in these hospice care cases, we don't have to show that the physician was lying when they made that certification. We have to show as to the falsity element that the claim was ineligible for payment. And that means it can mean, certainly if the physician was lying, that's pretty strong evidence, both as to falsity and to the answer. But even with the physician does this in a good faith way or just in a sloppy way, if there isn't the supporting documentation, that violates an independent condition of payment. And then the claim itself is false or fraudulent. Counselor, I know this 11th Circuit just decided yesterday, it came in early this morning, but I want to ask you about something at page 28. I don't expect you to have the decision. I've got the decision. But this 11th Circuit appears to read this hospice care provision, 42 U.S.C. 1395 F.A. 7A. 1, as in essence making some kind of delegation of authority to the physician. Quote, based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness. So this is italicized in this passage. So the 11th Circuit reads this as we've delegated this decision to whatever they've decided is reasonable. Now, I don't know that I've ever seen a Chevron-type delegation of power to a private party. It seems a little jurisprudentially odd. But tell me how the United States understands that language and the role of the physician or medical director's clinical judgment regarding the normal course of illness and why, I think you alluded earlier, why we should understand that as really just going to knowledge and not going to whether or not the claim is false in the first place. Does this affect other provisions, such as whether the government can get reimbursement for an innocent mistake? How would our reading affect the way that these false claims and reimbursements happen? Sure. Well, let me start, there's a lot there, but let me start with the delegation. We flatly reject that. I'm not sure that's what the 11th Circuit was saying, but it can't be right that we're delegating the authority out to the physician. There is no question that CMS recognizes that making prognoses of terminal illness is an inexact thing and that you can be wrong and that reasonable people can disagree at the margins of that. There's no question about that, and I'm sure you're going to hear a lot about that from the defendant's side. But it's in part because of that, that there are two conditions of payment. We don't just treat the physician's certification of terminal illness as conclusive. We actually require there to be documentation to back it up. And I would like to point the court to one other place. It's deep in the Federal Register, but just the clerks can look it up. 79 Federal Register 50, 470, and 71 are two pages that are guidance on determining the beneficiary's eligibility for hospice. And one of the things CMS says in that guidance is, we expect the documentation supporting a six-month or less life expectancy is included in the beneficiary's medical record and available to MACs, that's the Medicare contractors, when requested. And the point is, this is a belt and suspender thing. You want a physician exercising reasonable medical judgment to, you know, say that someone, I think someone is terminally ill. It's a very important decision. So you want documentation to be in the file. So I guess where I would say the 11th Circuit went astray, you were pointing me to the Acera Care opinion. I'm only now looking back. It's on page 32 of the opinion. This is where the 11th Circuit rejects the argument that I'm making right now. It says that the third line of that, of page 32, the government seeks to elevate the significance of the regulation supporting documentation requirement, asserting that eligibility, and then it quotes, turns on whether the clinical information and other documentation is in the record. That is still what we are arguing, and we still think that's right. So again, I said, you know, there's some good and some bad in Acera Care. It's unclear what on remand, you know, the practical effect of the test is, that they're going, you know, how much that's going to hamper us on remand, improving the claims in that case. But we do think that the court misunderstood the hospice eligibility requirements, and we don't want this court to make the same error in that respect. So Judge Bevis, I hope that answers your question in a very roundabout way. I've been up here for a very long time. I'm happy to stay. I'm happy to return for rebuttal. But unless the court has any further questions, it might be useful to hear from some other people. Did you reserve time for that? I didn't, but again, so I'll sit down. All right. Thank you very much, Mr. Scarborough. Mr. Paul. Good morning, Your Honors. I may please the court, Russell Paul, on behalf of Relators Appellants. With your permission, I'd like to reserve two minutes for rebuttal. Granted. Your Honors, not one, not two, but four former employees of Care Alternatives came forward to bring this action from four distinct and diverse positions in the company. If the court were to adopt the Eleventh Circuit ACERICARE decision, requiring more than just a difference of opinion of medical judgment, then here, Your Honor, we have that more. And we have more than even the more that they had in ACERICARE. Just a quick note about the legal standard. Defendants say that the district court's findings, factual findings should be reviewed on a clearly erroneous standard. That is wrong, Your Honor. It should be on a plenary review standard. And I point the court to the Rosen v. Besner Third Circuit Case 996F2-1527, where it says, in this situation, any application of a clearly erroneous standard is in itself clearly erroneous. ACERICARE itself lays out what types of facts would call into question whether the medical directors are actually exercising their subjective clinical judgment. To quote from ACERICARE, quote, objective falsehood can be shown in a variety of ways. And the first way is, quote, a claim may reflect an objective falsehood when expert evidence proves that no reasonable physician could have concluded that a patient was terminally ill given the relevant medical records. In that case, Your Honor, quote, the government's expert witness declined to conclude that ACERICARE's physicians had lied about their clinical judgment or even that their judgments were unreasonable or wrong. And in that case, quote, indeed the government's own witness conceded that trial that two doctors using their clinical judgment could come to different conclusions about a patient's prognosis and neither be right or wrong. That is clearly not the case here, Your Honor. Relators expert Dr. Jase testified over 18 times that, quote, in my opinion, any reasonable physician who took the same care that I did and was knowledgeable about the requirements would also agree, close quote, with him that certain patients were not hospice eligible. Let me ask you a question. Just take a sort of a broader view, if you will. So does that mean that ruling in your favor would mean that a mere disagreement as to the prognosis of terminal illness is all that's required for FCA liability? Well, that is our position. But I'm saying if that's not enough. So a mere disagreement? I used it purposefully. You would agree that that's enough for FCA liability? Well, I think that, as Mr. Scarborough said, if there's two disagreements regarding the underlying medical records and what they mean, then that should be enough to go to a jury to decide. I'm saying that that's not enough. If more is required, we have that more and much of it. And I'd like to go through what that more is. And the first more was that no reasonable physician could disagree that a patient should not be on hospice. When Dr. Jays was asked, quote, do you believe that two equally qualified physicians who have experience in hospice care could conduct the same review and come to a different conclusion as you? And he answered no. And in the end, he said that all physicians would agree with him. He said, quote, I would, as I said before, expect some dissenting opinions, but the vast majority would be come to the same conclusion, and I would regard those as unreasonable that didn't agree with me. Let me just follow up. So if a mere disagreement, and I know you say there's more here, but if a mere disagreement were enough, then what's the purpose of examining scienter, materiality, and causation? Those are stop gaps. So once you determine the falsity issue by a jury looking at the two opinions and the medical records that underlie those opinions, then you can determine falsity, and then there's protection for the defendants in those cases. There has to be materiality, and there also has to be scienter. All right, but you can't, I still don't understand Judge Greenaway's point, how you get to falsity if you're in the zone of reasonable physicians can disagree. Well. That seems to be the inverse of falsity. Yeah, but here we're saying reasonable physicians cannot disagree, and Dr. Jays testified to that fact. All right, so then what you have here is not, to his question, a debate between physicians expressing honest, different opinions. You've got, in your view, a clear misstatement of the person's prognosis. An expert here saying that no reasonable physician could disagree with his opinion. That wasn't the case in the SeraCare. Okay, and he does say that multiple times, but toward the end of his cross, he seems to sort of, I don't know if he withered under cross or what, but there is sort of an admission that the other side focuses on here. What's your response to that? Your Honor, the expert was questioned over 22 times about this issue. That is excessive. And then we specifically objected to those additional questions as harassing, and we moved to strike on the grounds of battering the witness. It wasn't stricken. But he testified over 18 times to the exact opposite. And in the end, when he collected himself. What did he say at the end? He said exactly that, that no reasonable physician could disagree with him. That was his final summation testimony. So you have a few snippets that defendants have cited, and you have over 18 examples where he said the exact opposite, that no reasonable physician could disagree. But you can't reconcile those. It does seem to be, his testimony seems to be at war with itself in some. Well, you've got a huge amount one way and a very small number of snippets the other in a very confusing and battering exchange with counsel. And that's not, that's only one example of the more that's required by ACERICARE. And I'd like to go into the others. We have five more buckets of facts that show that the physician was not exercising his subjective clinical judgment. All right, you're going through the facts, but do you want to just, do you agree that ACERICARE is right? I'm kind of surprised you're ceding that ground. I'm not agreeing it's right. I'm saying if you agree it's right. Well, why don't you tell us why you don't think it's right. Well, I think that I left that to Justice Scarborough. But what I'm saying is that if more is required, we have the more. And we have more than even what was in the ACERICARE decision. For instance, we have testimony from four different witnesses that medical rectors didn't attend meetings, didn't pay attention or participate when they did attend, and signed certifications in bulk after the meetings. And this is exactly what the court said in ACERICARE. Quote, to the extent that a reasonable jury might credit the government's proper evidence regarding ACERICARE's practices, that evidence suggests that ACERICARE certification procedures were seriously flawed. That goes to scienter, not to falsity. Isn't it possible, let's hypothesize that facilities are really, really busy. They're not very good at crossing their Ts and dotting their Is, but they're really, really good at determining who's entitled to hospice care. Okay? So they've got the treating physician, they've got the director of the facility saying, yes, person's eligible. At the end of every month, they put the paperwork together, post hoc. You know, they're not doing it the right way. But if they put all the paperwork together and the paperwork's accurate and the diagnosis is correct, are you saying that's a false claim? Well, that's not what happened here. I said it's hypothetical. I'm hypothesizing. That might be okay. That might be okay. All right. So it's not a gotcha game of, oh, you did this on a Thursday instead of a Tuesday. No, it's whether or not. It's two things we should be concerned about, that the country should be concerned about. Is the prognosis accurate and correct? And have they backed it up? Because we can't just accept the doctor's word because if the doctor blesses it as hospice eligible, if you can't look behind that, then we run the risk of doctors just saying that all the time. Well, you have to determine whether or not the doctor is exercising his subjective clinical judgment. And if he's not looking at it. But the way we know that is by looking at the documentation, right? No, you also look at his behavior. Was he at the meeting? That's the answer, not falsity, isn't it? No, no. There's no way he could have exercised his clinical judgment. There's no way he could have said that the patient was truly hospice eligible if he didn't even look at the records, if he wasn't even there. So let me ask you this, what I asked your colleague, Amicus. What's the rule that you are looking for us to adopt? That any time there's a genuine dispute as to physicians as to falsity, that FCA liability has been met? That it should go to the jury to judge the two different medical opinions and the underlying medical records that elucidate those opinions. That's what AUSA Scarborough was arguing. And I wholeheartedly agree with that. But my stopgap is if you don't agree with that, if you adopt a Sarah Care physician, that more is required. We have the more here, and we have much more than even the Sarah Care had. Okay, thank you. Thank you. Mr. Paul, we'll hear you on rebuttal. Mr. Popp? Good morning, Your Honors. Jason Popp for Appellate Care Alternatives. Your Honors, Mr. Scarborough made an important point this morning. These decisions are a big deal. And we highlighted some important points the relators made on page one of our summary judgment reply brief that puts this case in the context. Because the facts on which Judge Simandl entered summary judgment are getting lost in these legal arguments. First, the relators described the painful and emotional decision that a patient and their family must make to elect hospice. It's at that point they're foregoing curative care in place of palliative care. Second, the relators admitted as a fact that every patient made that decision, and every one of them was certified by both their personal physician and a medical director as being terminally ill. Even if that's accurate, even if they all had fewer than six months to live, it's still a false claim if you don't provide clinical information and other documentation that support the medical prognosis, or if you fail to provide a brief narrative explanation of the clinical findings that support the life expectancy of six months or less. Correct? You're addressing those questions in reverse. That second requirement was not implemented until the end of 2009, which postdates this litigation, the clinical narrative requirement. So B3 doesn't even apply to this case? It does not. In this case, it's B1 and B2. Okay. All right. And it's undisputed. But then is it correct, am I correct, that even if the diagnosis is correct, if they don't comply with B2, that is a false claim? If the information in the medical records objectively demonstrates that the patient is not terminally ill, then that could justify a false claim. It's undisputed. Wait, wait, wait. It has to objectively justify that it's not the right diagnosis? So if they provide no documentation, that doesn't say that the diagnosis is wrong. You're saying no documentation is fine? No, Your Honor. What I'm saying is, first, it's undisputed that each – and by the way, they're a prognosis, they're a prognosis of terminal illness. It's undisputed that they were all supported by clinical records. The issue that the government and the relators are saying is they look at those records and they disagree with the certifying physician. Because the reg says it has to support the medical prognosis, correct? It's not enough to just throw some paperwork in. Correct. That paperwork has to actually, through analysis, support the medical prognosis. Correct. And your position, as I understand it, is if reasonable minds can disagree about whether that documentation supports the prognosis, it can't be a false claims act. Correct. With the caveat, in this case, when there was no allegation that the physician believed his judgment to be true, and the relator said that on the last page of the reply brief to this court, no one is alleging that any physician made that certification without believing it to be true. That's been the case throughout this litigation until we got to this appeal. Judge Simandl held that of the complaint, that there's no indication that the directors are not exercising their clinical judgment. Let me ask you this. Is the falsity element dispositive on FCA liability? It is dispositive in this case. Well, let me ask you this question then. If we follow the district court's paradigm here and stop the inquiry once the two experts have expressed opposing views, doesn't that undermine the FCA's multi-element approach? It does not, because in this case, the question of falsity, it can be satisfied in any of four manners. One, as the court held, the opinion can be false if the director doesn't believe it to be true, the relator chose not to depose the physicians, but instead conceded that they did believe it to be true. Two, if the physician is aware of facts that conflict with his judgment. Or three, if that opinion is objectively unreasonable. And there's a reason for that. Could you tell me where the objective comes from? I don't see it in the statute. Your Honor, that's correct. It's not in the statute. At least eight circuits have applied that legal analysis in the false claims, including the Third Circuit. And I understand those were unpublished opinions, but they were correct. That in order for an opinion to be false, it's got to be objectively unreasonable. Okay. Tell me where in the statute of regulations I find support for that. There is nothing in the statute that uses the word objective. The interpretation of the law has applied to that. So why should we go that route? None of those authorities bind us. Tell us why we should be persuaded. Because the False Claims Act punishes palpable lies. It doesn't punish errors. It doesn't punish. See enter. Isn't the problem with a lot of these decisions that they're conflating see enter with falsity? Not in this case. It would be the case if there was an allegation that the physician didn't believe it to be true. In this case, where it's undisputed that the physician believes it to be true, and the question is whether or not the documentation supports it. The objective reasonability of that goes to falsity, not see enter. I thought the Supreme Court, in cases like Escobar, told us not to conflate these and to recognize that see enter does independent work here. How is your position consistent with Escobar? It is consistent.  The question is whether or not the clinical judgment is supported by the documentation. If there's no evidence that that clinical judgment is not objectively reasonable, then it's not false on its face. Forgive me. My questioning must be unclear. So perhaps I'll ask it a different way, and maybe you can answer it if I put it this way. You have 30 experts who say that this, that they would not have reached this diagnosis, and indeed that no physician would have reached this diagnosis. You put up one expert with a medical degree from a fourth-rate medical school who says, no, I would reach this. I would have made this diagnosis. Is that enough in every single case to defeat summary judgment, I mean to get summary judgment and cut the case off, a single expert who disagrees? So I'll address that twice. The second way, the way you described it, 30 experts, if those experts can point to an objectively verifiable fact that conflicts with the certifying physician's judgment, then yes, that could establish falsity. That would be objectively reasonable. In this case, I do want to make an important point. There are multiple opinions in this case. The certifying physician, whose opinion is unchallenged. The medical director, whose opinion is unchallenged. The defense expert, who opined that the record supported terminal illness in all circumstances. The only dissenting opinion, Your Honor, is the occasional opinion of the relator's expert, who testified clearly he would not expect unanimity in his opinion. And beyond that, it would not be simply enough for an expert simply to say- Why isn't that enough to create- We're trying to figure out when is it enough to create a genuine dispute to go on. Here, Judge Samandel said, nope, we're not going to go that route. Once we have the opinions, then it's all over. The question that Judge Beeb has put to you is, you know, try to engage in that question. So help us. Sure. So in particular in the hospice context, the way that Congress has legislated it and CMS has regulated it, they have deferred the decision to a physician. They haven't established any criteria that must be met. There are other cases in the health care context, including those cited in the briefs before this court, where in particular types of procedures the CMS has said, you have to meet A, B, C, and D to demonstrate medical necessity. Can I take you to your friend's reply brief at page 12, which walks through several particular examples? For instance, you have-there are nursing notes that indicate that AF could walk without assistance and stop to push another witness and said, let's go to my house. Or there's a CS who was ambulating around the house. There's someone who was claimed to have had dyspnea at rest when the medical record states the patient was out of bed in a wheelchair, in exercising activity, then church, smiling and laughing during exercise. Aren't those factual conflicts with what your physicians certified? First of all, Your Honor, they did not present that argument to the district court. Second of all, their own expert certified that particular of those patients you just identified were terminally ill based on the medical records. I'm so sorry to interrupt you, and I do beg your pardon, but the passages that were just read to you refer to the Jays' report. Are you saying the Jays' report wasn't in the record? The arguments about the particular patients were not submitted to summary judgment. But let me back up a minute because I want to make the point that, one, Dr. Jays said some of these patients were appropriate. But more importantly, to your question, Your Honor, Congress and CMS have made the decision not to impose that type of criteria. You can be able to walk and still be terminally ill. You can go to church and be terminally ill. In fact, when I end up in- What about doctors refusing to sign recertification papers? So, Your Honor, there's no evidence of that. There was an- PRPCS and ES. There's an allegation in the complaint that patients at one point, the physician decided to remove them from hospice, which is a perfectly appropriate decision by the physician. I do want to back up to one- Wait. You're saying that didn't happen? It never happened that attending physicians refused to sign recertification papers in this case? That evidence wasn't adduced. But even if it does, it doesn't matter because during a recertification, the physician is asked again, do you believe this patient to be terminally ill? And if the physician changes his mind, as Congress contemplates in the regulation, that is appropriate. I do want to make- Wait, wait. You're going too fast. Sorry. If the attending physician says, I don't think we- I'm not going to sign the recertification paper, you're saying the claim should still be paid? If the patient stayed on hospice after that, absolutely not. But in this case, that decision was not made. Once that decision was made, the patient was removed from hospice. So that never happened to AP, RP, CS, or ES? No, Your Honor. I do want to bring back one point that you raised about the fact that they identified that particular patients could walk and talk. So could Dr. Jays' patients. And I asked him that. I said, how many patients have you certified for hospice under the dementia criteria who could walk or who don't meet the criteria? And he said, probably close to half because these guidelines aren't only guidelines. They're not binding on us. So I do want to make that point. The relators also alleged in their complaint that patients could walk or talk. And then at deposition they said that is actually untrue. So, for example, with patient AP, they alleged in the complaint that this patient was clearly inappropriate for hospice. No one could think otherwise because she could walk and she was gaining weight. Then we identified a medical record created by Ms. Druding where she said the opposite, that the same patient was wheelchair-bound, meaning she can't walk, and that she had lost 47 pounds while in hospice. She executed on that same medical record. The undersigned Druding believes this patient remains appropriate for hospice and then listed a variety of reasons. So the allegations in the complaint, and Mr. Scarborough brought it up earlier, the allegations didn't bear out during discovery. And that's what's important in this case. Mr. Paul mentioned that they have other evidence to support their claims. Judge Simandl reviewed the factual record and made these findings clear. First, he identified the evidence that Ms. Coleman testified about. She was the longest-tenured relator by far of all of them. Go ahead. You have a great command of the facts, and this is very helpful, but I want to get at a more basic problem, which is your position seems to be predicated on the idea that the district judge fundamentally is going to be deciding which expert opinions are reasonable or in the realm of reasonableness, whereas our circuit precedent tells us that that's a jury question to sift among them. How is your position consistent with that? So in the false claims, I recognize that in certain malpractice cases that the credibility of an expert comes at. This isn't that case. Also, interestingly, and why should we draw a different line here? Because the expert, there was no disputed fact that the clinical judgments were not reasonable. And Judge, sorry, Dr. Jays' testimony is clear on that. How would you create a disputed fact in your view? Because it seems that our questioning to both sides have pointed out where there are doctor's views on one side of the question and doctor's views on the other side of the question. So if that doesn't, if that isn't enough, just sort of as a general principle, and you've got to dig down deeper, how in your view would you create a genuine dispute? Here's how I do it, and precedent supports it. First, I would follow U.S. pre-polis, and I would identify evidence in the record that demonstrated that the physician could not believe what he was writing down to be true. So for angiograms, when he looked at one thing and wrote down something different, I would point to evidence in the record to show that. Well, aren't you doing what Judge Hardiman talked about earlier, and that is conflating falsity and scienter? No, Your Honor, because in that… certifying something that he knows to be false, no? It would be pointing to something in the record similar to the Polikoff case as well. So if the certification says, I'm performing this surgery because I see a cryptogenic stroke, and then you look at the record and you see something that conflicts with that, verifiably, that's where it would come up. I do think, though, that the deposition testimony of the physician would be important, particularly, Your Honor, you bring up the malpractice issue. Of course, the defendant is deposed, and there's four ways to do it. Another good case is the Graves case from the Southern District of Florida. So that's a medical necessity case, where it was alleged that the defendant was submitting false diagnosis codes. What did they do? They deposed the physician, and he agreed. Okay, I'm looking at this record, and there's no medical evidence to support my certification. And that takes it away from this realm of a mere difference of opinion. That's a very rare situation. I mean, I think the concern you're hearing from all of us, and I've yet to hear you take head-on, is there are going to be a lot of cases in which the relator gets one expert, and the health care provider gets another expert. And the norm in most of our law is that survives summary judgment and goes to a jury. Now, the Eleventh Circuit just came out the other way, and that helps you. But it's pretty unusual, and it seems as if a lot of cases are going to get cut off. I see mechanisms on the government side. If we're concerned about floodgates, there are too many cases getting to a jury. The government can step in and stop some of these cases, and the government doesn't want all these health care providers to be sued. But if we go your way and cut these all off from a jury, what's to prevent a lot of health care providers from having a house expert who is especially favorable to them, testifying that this is a reasonable medical judgment, and then a lot of district judges, well-meaning, but nevertheless saying, okay, we have reasonable, we have reasonable, I'm not a doctor, I can't sort this out. It gets cut off. How do we, what's going to keep that from insulating an enormous amount of practice from any meaningful scrutiny? So two things. One, the government's administrative mechanisms. The government is not permitted to pay services that are not reasonable and necessary. The Acericare decision talked about that. It's got a variety of mechanisms to make sure that services are not being Walk me through the mechanisms that you think, even if there's no false claims, that liability are going to prevent against this floodgate fear. So the Solari case that the government mentioned? The way it works is that Medicare contracts with independent contractors to review claims that hospice providers submit. And if they review the documentation and say, I don't believe this was a terminally ill patient, they recoup the payment from the hospice provider. And at that point, it's on the hospice to prove that terminal illness was, in fact, supported by the record. So there is no concern about hospice providers getting paid for patients who are not terminally ill if the record doesn't support it. That's appropriate at the administrative level. And this circuit has talked about that, the existence of the administrative regime, particularly in the health care context, and not expanding the implied false certification theory expansively, Your Honor. Secondly, I do want to talk about the facts of this case. Because Mr. Scarborough made the point, well, if you endorse this opinion, it allows unscrupulous hospice providers to avoid false claims liability. If they can just get any medical director to sign off on a patient. First of all, that degrades the physicians in this case. That's what discovery is for, to test the premises of whether or not a hospice is, in fact, unscrupulous and having a physician sign off nilly-willy on patients who are giving up curative care. That's what discovery is for. And in this case, Your Honors, Judge Simandl wrote a thorough, articulate opinion. Well, what if we disagree with his legal standard? Tell us how you prevail if we disapprove of the objective falsity standard because it's not supported by the text of the statute or the regulations. The facts of the case don't support falsity in any manner, regardless of its objective. All there was was a difference of opinion. But more importantly, the facts, when the other side is talking about the other evidence they have, did not bear out. What you have in this case, when you look at the facts, which Judge Simandl distilled, and he made his opinion not on some grand legal proclamation, which this Court does not need to do either. All the question is whether Judge Simandl got it right when he held that the facts did not support the element of falsity. In this case, objective falsity. But, Your Honor, he did go on to address the other elements that the relators had alleged. This is not a case where I'm just up here saying relators didn't prove it. This is a case where the relators testified against the allegations of their complaint. So it's important to talk about that. Because initially they focused on the false documentation. Correct. But what the relators said to avoid dismissal. And this is important. And I know I've got a minute left. This is critically important. At the motion to dismiss phase, this was 2016, that's when the first Acera Care opinion came out of the District Court that said objective falsity is a standard. A difference of opinion is not enough. The relators confronted that head-on for an entire page of their SIR reply brief in opposition to the motion to dismiss. They said this is not Acera Care. This is different from Acera Care. We're going to provide testimony. We are not just going to rely on expert. And you see their appeal. The appeal says, hey, let us just rely on expert to get by. That's not what they told Judge Simandl to get past their motion to dismiss. What would you expect from that type of a vermin? That we're going to have testimony to prove this. You might have testimony from a physician saying, I wasn't exercising my clinical judgment. You might have testimony from family members saying my loved one was. It's not the first time a lawyer's lead argument fell flat. So good lawyers fall back and go to their second argument. I agree, but that was. This shouldn't be an objective falsity, right? And the government, which didn't adopt the case, at least agrees with them on that. Well, I would say that the averments in the complaint were proven false. Your Honor, I have only five seconds left. I want to make one point about waiver, if I may. We did not file a SIR reply brief because I figured I could address this before the panel first. The relators in their reply brief said that we never made the argument that a causal link is necessary to support the false claim. That is plainly untrue. We argued this on pages 30 to 31 of our opening brief in support of summary judgment and pages 11 to 12 of our reply brief in a section titled, Relators Fail to Produce an Evidentiary Link Between Their Allegations and the False Claims. Another issue I want to make, and I would implore your Honors to review the summary judgment briefing because it's different than what was briefed at this court. There is nowhere in the summary judgment briefs, anywhere, that the relators allege that a physician did not exercise his clinical judgment. Nor did the relators ever say in those briefs that physicians were not attending interdisciplinary team meetings. They're asking for reversal on part on arguments that they did not present to the district court. And one more piece that I would say about that is the evidence, as Judge Simandl distilled, plainly refutes that based on the testimony of the relators themselves. Thank you, Mr. Pott. Mr. Paul, on rebuttal. Before I start, Your Honor, may I be allowed to cede 30 seconds of my rebuttal to A.O.S.A. Scarborough? Three seconds. Thirty seconds. Sure. Yes, thank you. So I just want to get... You have a minute and a half? Yes. Okay, go ahead. I just want to get these five bullet points out there really quickly. You cannot trust the medical director's opinion on hospice eligibility for these five reasons. The medical directors often did not attend meetings. Secondly, there was company-wide pressure to bring in the bodies and admit patients. Third, employees were instructed to alter medical records after the fact, after the medical directors looked at them, showing that they did not have the proper documentation at the time they were reviewed. Third, employees were pressured to chart to the negative. That means put information in the chart that would support hospice eligibility and exclude information that would undermine hospice eligibility. Fifth, there were quarterly clinical record audits. The company knew it had a problem with its documentation, and it went and looked at them to see, you know, what the problem was, and it found that 87% of the time, in one quarter, there was not enough information in the record. It had to redo it. The Justice Emanuel did not look at all of the evidence. He did not look at our response to their statement of facts, and he disregarded the counterstatement of facts. And all the record of evidence is before your honors right now. Thank you, Mr. Paul. Mr. Scarborough, everything Mr. Paul just said, as far as I can tell, goes to SIENTA, not to Falsity, correct? I think a lot of the evidence goes to both. And, again, I want to emphasize this is sort of the preliminary. I think, Judge Greenaway, you got it. This is just one element of the many elements of False Claims Act liability. I just have two quick points, and I really appreciate the Court's indulgence in letting me stand up again. First, Judge Bevis, you were asking about the objective falsity label. It's atextual. It's found nowhere in the False Claims Act. It's made up. It's basically a label that comes when courts get suspicious of second-guessing medical judgment in a False Claims Act arena. And we understand why courts have that feeling, because they're worried about imposing travel damages, False Claims Act liability. However, those sorts of things about a reasonable position, they go to SIENTA, to get back to your point, Judge Hardiman. And the second point that I would like to make is – I'm sorry. Let me cut you off there. Yeah. Can you still get summary judgment on the SIENTA issue, or are all these cases going to go to jury trial? No. I think you absolutely could get summary judgment on the SIENTA issue, and that's why – Just through the usual discovery process? That's right. And I think that in terms of, like, the parade of horribles that comes from the defense side about, you know, it's just going to be one expert versus another expert, there are limiting principles. Trial judges are not – they're not completely hands tied. There's Daubert motions that could be made to get rid of the really, you know, quack sort of experts saying that no reasonable physician could have done this, that sort of thing. The second point that I wanted to make, and I realize I'm very over time, is that there are two False Claims Act provisions at issue here, and one requires an expressed false statement used to – that is material to a false or fraudulent claim. The other one just – and I'm going to quote here, 3729A1A, just imposes liability on any person who knowingly presents a false or fraudulent claim for payment. So there doesn't have to be an expressed false statement. The certification does not have to be expressly false. It doesn't have to be a lie. It has to be a claim that comes to CMS for payment that is ineligible for payment. That's what makes a claim false. Even with the best of intentions. Yes, Your Honor, and again – Which gets back to a lack of documentation. That's correct, Your Honor, and that's what the issue is about. That's what the dispute is, is is there sufficient documentation to meet that second requirement, that's the condition of payment. Thank you, Your Honor. Thank you to all counsel for the very helpful argument. We'll take the matter under advice.